IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHANIE MARSHALL,          :
                             :
          Plaintiff          :     CIVIL NO. 4:10-CV-1978
                             :
     vs.                     :
                             :
MICHAEL J. ASTRUE,           :
COMMISSIONER OF SOCIAL       :     (Judge Rambo)
SECURITY,                    :
                             :
          Defendant          :

<u>MEMORANDUM AND ORDER</u>

<u>Background</u>

The captioned action seeks a review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Stephanie Marshall's claim for supplemental security income benefits.  For the reasons set forth below we will affirm the decision of the Commissioner.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

Marshall was born in the United States on February 3, 1958. Tr. 26, 42 and 89-90.[1]  Marshall completed the 11th grade in 1976 and can read, write, speak and understand English. Tr. 26, 113 and 119. There is no indication that Marshall, after withdrawing from high school, obtained a General Equivalency Diploma. Id.

At some point prior to 1980 Marshall obtained a commercial driver's license. Tr. 27 and 109.  From 1980 to 1989 Marshall reported that she worked as a school bus driver 8 hours per day, 5 days per week, and earned $9.00 per hour. Tr. 109.  From 1990 to 1995 Marshall reported that she operated two video stores. Tr. 28 and 110.  Marshall stated that she worked at the video stores 8 hours per day, 5 days per week and earned $300.00 per week. Id.  Marshall also stated that she "was the president" of the video stores and she "order[ed] the tapes and rotate[d] the walls and put out product." Id. at 28.

---

1.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on December 6, 2010.

Although Marshall testified that she last worked at the video store in 1995, records of the Social Security Administration only reveal earnings for the years 1974, 1975 and 1980 through 1985. Tr. 28 and 98. Her total earnings for those years were $17,821.30.[2] Tr. 98.  Marshall testified with respect to her earnings from the video stores that her "accountant never declared it." Tr. 28.  There was no explanation given for the absence of reported earnings for the years 1986 through 1989 when she worked as a school bus driver. Marshall has not worked since January 1, 1995.[3] Tr. 114.

On September 8, 2008, Marshall protectively filed[4] an application for supplemental security income benefits. Tr. 9, 42, 89, 90-96 and 104.  Marshall

---

2.  Marshall earned $91.35 in 1974, $266.06 in 1975, $394.20 in 1980, $1940.86 in 1981, $5340.31 in 1982, $5748.88 in 1983, $3919.64 in 1984 and $120.00 in 1985. Tr. 98.

3.  Marshall testified that she last worked in "1995 when [she] was raped." Tr. 28.

4.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

claimed that she became disabled on January 1, 2000, because of anxiety, depression, and stomach and heart problems. Tr. 43 and 114.  In the present appeal she claims that she is totally disabled because of major depressive disorder, recurrent; posttraumatic stress disorder; panic disorder with agoraphobia;[5] hypertension; kyphoscoliosis;[6] and osteoarthritis. (Doc. 8, Pl.'s Brief, p. 2.)

_____

5.  According to the National Institute of Health's website

> [p]anic disorder with agoraphobia is an anxiety disorder in which there are repeated attacks of intense fear and anxiety, and a fear of being in places where escape might be difficult, or where help might not be available.

> Agoraphobia usually involves fear of crowds, bridges, or of being outside alone.

Panic disorder with agoraphobia, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001921/ (Last accessed November 8, 2011).

6.  Kyphoscoliosis is a "backward and lateral curvature of the spinal column." Dorland's Illustrated Medical Dictionary, 886 (27th Ed. 1988). A person with this condition has a lateral hunchback appearance.

Marshall's alleged disability onset date of January 1, 2000, has no impact on Marshall's application for supplemental security income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met." See C.F.R. § 416.501. Consequently, Marshall is not eligible for SSI benefits for any period prior to October 1, 2008.

On February 10, 2009, the Bureau of Disability Determination[7] denied Marshall's application. Tr. 43-47. On March 14, 2009, Marshall requested a hearing before an administrative law judge. Tr. 48 and 102.  After approximately 10 months had passed a hearing was held before an administrative law judge on January 20, 2010. Tr. 22-41.  On February 4, 2010, the administrative law

_____

7.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for supplemental security income benefits on behalf of the Social Security Administration. Tr. 44.

judge issued a decision denying Marshall's application for benefits. Tr. 9-19.  On April 7, 2010, Marshall filed a request for review of the administrative law judge's decision with the Appeals Council of the Social Security Administration. Tr. 87-88.  The Appeals Council on September 9, 2010, concluded that there was no basis upon which to grant Marshall's request for review. Tr. 1-5.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On September 22, 2010, Marshall filed a complaint in this court requesting that we reverse the decision of the Commissioner and award her benefits, or remand the case to the Commissioner for further proceedings.

The Commissioner filed an answer to the complaint and a copy of the administrative record on December 6, 2010.  Marshall filed her brief on January 18, 2011, and the Commissioner filed his brief on March 24, 2011.  The appeal[8] became ripe for disposition on

---

8.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security

(continued...)

April 11, 2011, when Marshall elected not to file a
reply brief.

## STANDARD OF REVIEW

When considering a social security appeal, we
have plenary review of all legal issues decided by the
Commissioner.  See Poulos v. Commissioner of Social
Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v.
Commissioner of Social Sec. Admin., 181 F.3d 429, 431
(3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857,
858 (3d Cir. 1995).  However, our review of the
Commissioner's findings of fact pursuant to 42 U.S.C. §
405(g) is to determine whether those findings are
supported by "substantial evidence."  Id.; Brown v.
Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v.
Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual
findings which are supported by substantial evidence
must be upheld. 42 U.S.C. §405(g); Fargnoli v.
Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the

_____

8.  (...continued)
Administration denying a claim for social security
disability benefits" is "adjudicated as an appeal."
M.D.Pa. Local Rule 83.40.1.

7

ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an

adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d

Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating supplemental security income claims.  See 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of

---

[9]  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

[10]   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 416.923 and 416.945(a)(2). An impairment

(continued...)

impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity.[12] Id.

_____

10.  (...continued)
significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 416.945(c).

11.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

12.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; 20 C.F.R. § 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**<u>MEDICAL RECORDS</u>**

13

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Marshall's medical records.[13]

The first medical record that we encounter is from 2003.  On July 11, 2003, Marshall had an appointment with her primary care physician, Mark Murnin, D.O. Tr. 295-296.  The record of this appointment is only partially legible.  Dr. Murnin noted that Marshall weighed 142 pounds, her blood pressure was 110/70 and her pulse was 80; that Marshall was a rape victim; Marshall was positive (+) for smoking 1 pack of cigarettes per day for 20 years and she was positive (+) for alcohol use but negative for drug abuse. Id.  When

_____

13.  At the administrative hearing in this case, Marshall was represented by counsel and the administrative law judge asked counsel whether he had "additional documents he wanted to submit." Tr. 25. Counsel indicated there were no further documents he desired to present. Id.  The medical records which we are reviewing are those admitted at the administrative hearing held on January 20, 2010. Counsel for Marshall in the present appeal has not proffered any additional medical records.

Dr. Murnin conducted a review of Marshall's systems[14] he indicated that she was without[15] weakness, fatigue, chills, fever, night sweats, blurred vision, hearing loss, tinnitus, vertigo, nasal discharge, sinusitis, chest pain, shortness of breath cough, wheezing, nausea, vomiting, diarrhea, constipation, abdominal pain, melena, hematochezia,[16] change in bowel movements,

---

14.  "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed November 8, 2011).

15.  The medical abbreviation used for "without" or "none" is often a circle with a line vertically or horizontally through the circle.

16.  Melena is defined as "the passage of dark, pitchy, and grumous stools stained with blood pigments or with altered blood" and "black vomit." Dorland's Illustrated Medical Dictionary, 999 (27th Ed. 1988).  Hematochezia is defined as "the passage of bloody stools." Id. at 741.

dysuria, nocturia,[17] myalgia, arthralgia,[18] back pain, heat/cold intolerance, hoarseness, weight change, polyuria, polydipsia, polyphagia,[19] weakness and numbness. Id.  The results of a physical examination were essentially[20] normal except that Dr. Murnin noted

_____

17.  Dysuria is "painful or difficult urination." Dorland's Illustrated Medical Dictionary, 522 (27th Ed. 1988). Nocturia is "excessive urination at night." Id. at 1141.

18.  Myalgia is "pain in a muscle or muscles." Dorland's Illustrated Medical Dictionary, 1083 (27th Ed. 1988). Arthralgia is "pain in a joint." Id. at 147.

19.  Polyuria is "the passage of a large volume of urine in a given period, a characteristic of diabetes." Dorland's Illustrated Medical Dictionary, 1336 (27th Ed. 1988). Polydipsia is "chronic excessive thirst, as in diabetes mellitus or diabetes insipidus." Id. at 1330. Polyphagia is "excessive eating; gluttony." Id. at 1334.

20.  During 2003, 2004, and 2005 Dr. Murnin did note that Marshall's extremity pulses were 2/4, a slightly more diminished pulse than normal.  3/4 is considered normal.  Bookshelf, Chapter 30 Examination of the Extremities: Pulses, Bruits, and Phlebitis, Clinical Methods: The History, Physical, and Laboratory Examinations. 3rd Ed. Walker HK, Hall WD, Hurst JW, editors. Boston: Butterworths; 1990, http://www.ncbi.nlm.nih.gov/books/NBK350/ (Last accessed November 7, 2011).

that Marshall had positive (+) distress. Id.  The court

is unable to determine Marshall's chief complaint on

this date or Dr. Murnin's assessment.  Dr. Murnin did

order blood work (a complete blood count and a complete

metabolic panel). Id.  A laboratory report of blood

drawn on July 11, 2003, revealed that Marshall had high

cholesterol, triglycerides and LDL cholesterol. Tr. 304.

The record of an appointment with Dr. Murnin on

September 11, 2003, is also only partially legible. Tr.

293-294.  We can discern, however, that Dr. Murnin noted

that Marshall weighed 140 pounds, her blood pressure was

120/80 and her pulse 80, and that Marshall had

uncontrolled hypercholesterolemia.[21] Id.  It also appears

that on or before this date Marshall had quit smoking

and consuming alcohol. Id.  When Dr. Murnin reviewed

Marshall's systems, his findings were all negative,

including that Marshall did not suffer from any

myalgias, arthralgias or back pain and she did not

---

21.  Hypercholesterolemia is "excess of cholesterol in
the blood." Dorland's Illustrated Medical Dictionary,
791 (27th Ed. 1988).

complain of depression, anxiety, stress or insomnia. Id.
The results of a physical examination were normal. Id.
Dr. Murnin's assessment and plan of action is only
partially legible. Dr. Murnin concluded that Marshall
suffered from hypertension and hypercholesterolemia. Id.
Dr. Murnin ordered blood work (a complete metabolic
panel) and scheduled a follow-up appointment in three
months. Id.

In 2004 Marshall had appointments with Dr.
Murnin on January 22, May 27, September 30 and December
4. Again the records of the appointments are only
partially legible.

On January 22, 2004, when Dr. Murnin reviewed
Marshall's systems, his findings were all negative,
including that Marshall did not suffer from any
myalgias, arthralgias or back pain and she did not
complain of depression, anxiety, stress or insomnia. Tr.
291-292. Id. The results of a physical examination were
essentially normal. Id. Marshall's blood pressure was
100/60. Id. Dr. Murnin's assessment and plan of action

18

is only partially legible. Dr. Murnin concluded that Marshall suffered from hypercholesterolemia. Id. Dr. Murnin ordered blood work (a complete blood count, a complete metabolic panel and a fasting lipid profile). Id. The results of the blood work revealed that Marshall had high cholesterol and high triglycerides. Tr. 300.

The record of the May 27, 2004, appointment is similar except under review of systems Dr. Murnin noted that Marshall suffered from anxiety. Tr. 289-290. The results of a physical examination were essentially normal. Id. Marshall's blood pressure was 130/80. Id.

The record of the September 30, 2004, appointment reveals that Marshall's blood pressure was under control (110/70) but that she was suffering from high cholesterol. Tr. 287-288. The results of a physical examination were essentially normal. Id. Dr. Murnin ordered blood work. Id. The results of the blood tests revealed that Marshall had high cholesterol. Tr. 297.

The record of the December 4, 2004, appointment reveals that Marshall's blood pressure was under control (120/80) and when Dr. Murnin reviewed Marshall's systems, his findings were all negative, including that Marshall did not suffer from any myalgias, arthralgias or back pain. Tr. 285-286. The results of a physical examination were essentially normal. Id.

In 2005 Marshall had appointments with Dr. Murnin on February 10, June 23, and October 27.  Again the records of the appointments are only partially legible.

On February 10, 2005, Marshall's blood pressure was 140/80 and when Dr. Murnin reviewed Marshall's systems, his findings were all negative, except he noted Marshall suffered from anxiety and hypercholesterolemia. Tr. 283-284.  The results of a physical examination were essentially normal. Id.  Dr. Murnin ordered blood work. Id.

On June 23, 2005, Marshall's blood pressure was 110/70 and when Dr. Murnin reviewed Marshall's systems,

his findings were all negative, including that Marshall did not suffer from any myalgias, arthralgias or back pain and she did not complain of depression, anxiety, stress or insomnia. Tr. 281-282.  The results of a physical examination were essentially normal. Id.  Dr. Murnin noted that Marshall's anxiety, high blood pressure and high cholesterol were under control. Tr. Tr. 281.

On October 27, 2005, Marshall's blood pressure was 140/80 and when Dr. Murnin reviewed Marshall's systems, his findings were all negative, including that Marshall did not suffer from any myalgias, arthralgias or back pain and she did not complain of depression, anxiety, stress or insomnia. Tr. 279-280.  The results of a physical examination were essentially normal. Id. Dr. Murnin noted that Marshall's blood pressure was controlled. Tr. 280.

In 2006, Marshall had appointments with Dr. Murnin on March 23, July 24 and December 4.  The record

of the appointment on March 23 is partially legible and
the other two records are typewritten.

At the appointment on March 23, 2006, Marshall
complained of depression. Tr. 277-278.  When Dr. Murnin
reviewed Marshall's systems, his findings were all
negative, including that Marshall did not suffer from
any myalgias, arthralgias or back pain, except Marshall
suffered from depression and anxiety. Id.  The results
of a physical examination were essentially normal. Id.
Dr. Murnin concluded that Marshall suffered from
depression and  prescribed the drug Paxil.[22] Id.  He also
noted that she had controlled high blood pressure. Id.

At the appointment with Dr. Murnin on July 24,
2006, Marshall complained of heartburn, anxiety and
depression. Tr. 253-254. When Dr. Murnin reviewed

---

22.  "Paxil (paroxetine) is an antidepressant belonging
to a group of drugs called selective serotonin reuptake
inhibitors (SSRIs). Paxil affects chemicals in the
brain that may become unbalanced. Paxil is used to
treat depression, obsessive-compulsive disorder,
anxiety disorders, posttraumatic stress disorder (PTSD)
and premenstrual dysphoric disorder (PMDD)." Paxil,
Drugs.com, http://www.drugs.com/paxil.html (Last
accessed November 8, 2011).

Marshall's systems, his findings were all negative, including that Marshall did not suffer from any myalgias, arthralgias, arthritis, muscle weakness, and paresthesia. Id.  Marshall's blood pressure was 120/80. Id.  The results of a physical examination were essentially normal. Id.  It was stated that Marshall walked with a normal gait and she had full range of motion without discomfort. Id.  Marshall's motor strength in the upper and lower extremities bilaterally was 5/5[23] and her reflexes were brisk and symmetrical. Id.  Marshall had intact recent and remote memory. Id. It appears that Marshall started smoking prior to the appointment because Dr. Murnin counseled Marshall regarding smoking cessation. Id.  Dr. Murnin's assessment was that Marshall suffered from well-controlled high blood pressure, depression, anxiety, tobacco use disorder and gastroesophageal reflux

_____

23.  5/5 is normal muscle strength. Strength of Individual Muscle Groups, Neuroexam.com, http://www.neuroexam.com/neuroexam/content.php?p=29 (Last visited November 8, 2011).

disease. Id.  Dr. Murnin prescribed Dyazide and
Propranolol for Marshall's high blood pressure, Effexor[24]
and Valium for her anxiety, and Protonix[25] for her
gastroesophageal reflux disease. Id.

At the appointment with Dr. Murnin on December
4, 2006, Marshall complained of an upper respiratory
infection. Tr. 257-259.  Dr. Murnin noted that
Marshall's anxiety, depression, high blood pressure and
gastroesophageal reflux disease had been well controlled
since the last visit. Id.  It was stated that Marshall
was taking her medications as prescribed and that she
had no difficulty concentrating and had no fatigue. Id.
When Dr. Murnin reviewed Marshall's systems, his

---

24. "Effexor (venlafaxine) is an antidepressant . . .
used to treat major depressive disorder, anxiety, and
panic disorder." Effexor, Drugs.com, http://www.drugs.
com/effexor.html (Last accessed November 8, 2011).

25. "Protonix is in a group of drugs called proton pump
inhibitors. It decreases the amound of acid produced in
the stomach. Protonix is used to treat erosive
esophagitis (damage to the esophagus from stomach
acid), and other conditions involving excess stomach
acid[.]" Protonix, Drugs.com, http://www.drugs.com/
protonix.html (Last accessed November 8, 2011).

findings were all negative, including that Marshall did not suffer from any myalgias, arthralgias, arthritis, muscle weakness, dizziness, headache and paresthesia.[26] Marshall did report anxiety but denied depression. Id. Marshall's blood pressure was 110/70. Id. The results of a physical examination were essentially normal. Id. It was stated that Marshall walked with a normal gait and she had full range of motion without discomfort. Id. Marshall's motor strength in the upper and lower extremities bilaterally was 5/5 and her reflexes were brisk and symmetrical. Id. Marshall had intact recent and remote memory. Id. Marshall's mood and affect were normal and she was oriented to person, place and time. Id. Dr. Murnin prescribed Dyazide and Propranolol for Marshall's high blood pressure, Effexor and Valium for her anxiety and depression, Chantix for her tobacco use disorder, Protonix for her gastroesophageal reflux

_____

26. Paresthesia is a "morbid or perverted sensation; an abnormal sensation, as burning, prickling, formication, etc." Dorland's Illustrated Medical Dictionary, 1232 (27th Ed. 1988).

disease and Levaquin, an antibiotic, for her upper respiratory infection. Id.

On or about December 14, 2006, Marshall suffered an injury to her left hand. Tr. 159-160.  However, an x-ray revealed no abnormal soft tissue swelling and no fracture or other lesion. Id.

In 2007, Marshall had appointments with Dr. Murnin on April 30 and September 17.  The records of these appointments are typewritten.

On April 30, 2007, Marshall complained of an upper respiratory infection. Tr. 260-261. It was stated that Marshall's high blood pressure, gastroesophageal reflux disease, and anxiety were well controlled since the last visit and Marshall was taking her medications as prescribed. However, as for Marshall's depression it was noted that it had been "worsening since the last visit" because Marshall was "not taking [her] prescribed medication." Id.  When Dr. Murnin reviewed Marshall's systems, his findings were all negative, including that Marshall did not suffer from any myalgias, arthralgias,

muscle weakness, dizziness, headache and paresthesia. Id.  Marshall did report anxiety and depression. Id. Marshall's blood pressure was 130/80. Id.  The results of a physical examination were essentially normal. Id. It was stated that Marshall walked with a normal gait and she had full range of motion without discomfort. Id. Marshall's motor strength in the upper and lower extremities was normal. Id.  Marshall's mood and affect were normal and she was oriented to person, place and time. Id.  Dr. Murnin noted that Marshall smoked one pack of cigarettes daily and occasionally consumed alcohol. Id.

On September 17, 2007, Marshall complained of an upper respiratory infection. Tr. 263-265.  The findings by Dr. Murnin on that date were similar to those found on April 30, 2007.  It was stated that Marshall's high blood pressure, gastroesophageal reflux disease, and anxiety were well controlled since the last visit and Marshall was taking her medications as prescribed. However, as for Marshall's depression it was noted that

it had been "worsening since the last visit" because
Marshall was "not taking [her] prescribed medication."
Id.  When Dr. Murnin reviewed Marshall's systems, his
findings were all negative, including that Marshall did
not suffer from any myalgias, arthralgias, muscle
weakness, dizziness, headache and paresthesia. Id.
Marshall did report anxiety and depression. Id.
Marshall's blood pressure was 116/68. Id.  The results
of a physical examination were essentially normal. Id.
It was stated that Marshall walked with a normal gait
and she had full range of motion without discomfort. Id.
Marshall's motor strength in the upper and lower
extremities was normal. Id.  Marshall's mood and affect
were normal and she was oriented to person, place and
time. Id.  Dr. Murnin advised Marshall to quit smoking.
Id.

 In 2008, Marshall had four appointments with Dr.
Murnin.  The first appointment was May 22, 2008. Tr.
266-268.  The chief complaint at that appointment was
right knee pain and a urinary tract infection. Id.  A

review of Marshall's systems was essentially normal. Id. Marshall did report "not feeling well." Id. Marshall's blood pressure was normal (120/80). Id. The results of physical examination were essentially normal. Id. Marshall walked with a normal gait and she had full range of motion without discomfort. Id. Marshall's motor strength in the upper and lower extremities was normal. Id. Marshall's mood and affect were normal and she was oriented to person, place and time. Id. Dr. Murnin's assessment was that Marshall suffered from a urinary tract infection and prescribed the antibiotic Cipro. Tr. 267.

On June 23, 2008, Marshall was transported by ambulance to the emergency department at Wayne Memorial Hospital, Honesdale, Pennsylvania. Tr. 172-175 and 193. Marshall's chief complaint was chest pain which started on June 22, 2008. Tr. 172. Marshall admitted she was "abusing alcohol recently with the passing of her mother." Tr. 167. Other than symptoms relating to the chest pain, the results of a physical examination were

normal. Tr. 204-205.  Marshall's blood pressure was

normal (114/75). Tr. 163.  Numerous diagnostic tests

were ordered, including a chest x-ray, EKG and complete

blood count and chemistry. Tr. 173 and 193-200.

Marshall had elevated liver function blood tests

(alanine aminotransferase (ALT) and aspartate

aminotransferase (AST)).[27] Tr. 169.  Marshall was

discharge from the hospital the same day in a stable

condition with a diagnosis of hyponatremia,[28] vomiting,

and non-cardiac chest pain. Tr. 193. Marshall refused to

have an ultrasound of the gallbladder. Tr. 168.

On June 25, 2008, Marshall had an appointment

with Dr. Murnin regarding the chest pain and vomiting

---

27.  ALT and AST are enzymes which are normally
contained within liver cells. If the liver is injured,
damaged or infected, the liver cells spill these
enzymes into the blood. Liver Blood Test,
MedicineNet.com, http://www.medicinenet.com/liver_
blood_tests/article.htm (Last accessed November 7,
2011).

28.  Hyponatremia is "a condition that occurs when the
level of sodium in your blood is abnormally low."
Hyponatremia, Definition, Mayo Clinic staff, http://www
.mayoclinic.com/health/hyponatremia/DS00974 (Last
accessed November 7, 2011).

that occurred on June 23rd. Tr. 269-270.  Marshall at
this appointment stated that she felt "somewhat better."
<u>Id.</u>   When Dr. Murnin reviewed Marshall's systems, his
findings were all negative, including that Marshall
denied anxiety, depression, fatigue, feeling weak, chest
discomfort and pain, cough, shortness of breath and
musculoskeletal symptoms. <u>Id.</u>  Marshall's blood pressure
was normal (120/80). <u>Id.</u>  The results of physical
examination were essentially normal. Tr. 269. Marshall
walked with a normal gait and she had full range of
motion without discomfort. <u>Id.</u>  Marshall's motor
strength in the upper and lower extremities was normal.
<u>Id.</u>  Marshall's mood and affect were normal and she was
oriented to person, place and time. <u>Id.</u>  Dr. Murnin
ordered additional blood tests and an ultrasound of the
abdomen and scheduled a follow-up appointment. Tr. 270.
The ultrasound dated June 26, 2008, revealed "[n]o acute
intraabdominal findings" and a "[n]ormal gallbladder."
Tr. 212.

On July 2, 2008, Marshall had a follow-up appointment with Dr. Murnin. Tr. 273-274. At this appointment Marshall complained of abdominal pain. Id. Dr. Murnin noted that Marshall was smoking one pack of cigarettes per day and "consum[ing] alcohol – apparent heavy use at least at times reported by area [agency] of aging[.] Mrs. Marshall admits to only occasional use." Id.  The results of a physical examination were essentially normal. Tr. 274. Marshall did have "mild tenderness in the epigastric region" of the abdomen.[29] Id.

Dr. Murnin's assessment was that Marshall was suffering from a peptic ulcer without hemorrhage, perforation, or obstruction and advised Marshall to avoid greasy, spicy and fatty foods. Id.  Dr. Murnin continued Marshall's prescription for Protonix and scheduled a follow-up appointment. Id.

---

29.  The epigastric region is the upper central region of the abdomen. Upper Central Abdominal Pain, Abdopain.com, http://www.abdopain.com/upper-central-abdominal-pain.html (Last accessed November 8, 2011).

On July 23, 2008, Marshall had an appointment with Dr. Murnin. Tr. 275-276. At that appointment it was noted that Marshall's gastroesophageal reflux disease was uncontrolled. Id.  Marshall's blood pressure was normal (120/70). Id.  The results of physical examination were essentially normal. Id.  Dr. Murnin's assessment was that Marshall suffered from gastroesophageal reflux disease, prescribed Raglan[30] and referred Marshall to a gastroenterologist to have an esophagogastroduodenoscopy (EGD). Id.

On or about July 28, 2008, Marshall had an appointment with David D. Reynold, M.D., Northeastern Gastroenterology Associates, P.C., Honesdale. Tr. 220-223. Dr. Reynolds in the opening paragraph of his report states that Marshall after recently losing her mother

---

30.  "Raglan (metoclopramide) increases muscle contractions in the upper digestive tract. This speeds up the rate at which the stomach empties into the intestines.  Raglan is used short-term to treat heartburn caused by gastroesophageal reflux in people who have used other medications without relief of symptoms." Raglan, Drugs.com, http://www.drugs.com /raglan.html (Last accessed November 8, 2011).

"began abusing herself and drinking alcohol excessively" and "she is a chronic smoker." Tr. 220. It was noted that she smoked two packs of cigarettes per day. Tr. 221.   Marshall described "chest pain which seem atypical in nature and likely consistent with gastroesophageal reflux." Tr. 221.   The results of a physical examination were essentially normal. Tr. 222.   Dr. Reynolds did note that Marshall had "evident kyphoscoliosis." <u>Id.</u>   Dr. Reynold's assessment was that Marshall suffered from "mid-epigastric abdominal pain associated with atypical chest pain" and recommended an upper endoscopic examination.   Tr. 223.   On August 1, 2008, Dr. Reynolds performed that procedure. Tr. 215.   The endoscope revealed reflux esophagitis and chronic gastritis without hemorrhage.[31] Tr. 216.

---

31.  Reflux esophagitis is an inflammation of the lining of the esophagus caused by the migration of stomach acid upward to the esophagus.  Reflux Esophagitis, Drugs.com, http://www.drugs.com/cg/reflux -esophagitis.html (Last accessed November 8, 2011). Gastritis is an inflammation of the lining of the stomach. Gastritis, MedlinePlus, http://www.nlm.nih.gov /medlineplus/ency/article/001150.htm (Last accessed
(continued...)

On January 2, 2009, Darlene Nalesnik, Ph.D., a
clinical psychologist, performed a consultative
psychological evaluation of Marshall on behalf of the
Bureau of Disability Determination. Tr. 224-228.  At
that evaluation Marshall denied any drug or alcohol use
or abuse. Tr. 225.  Marshall described daily depression
with a current level of 9 on a scale of 1 to 10. Tr.
226.  Marshall expressed suicidal ideations but no
intention or plan. Id.  Marshall had a blunted affect
and mood was anxious and depressed. Id.  Marshall stated
she had daily fatigue and described attention and
concentration, and short-term memory problems at home.
Id.  Dr. Nalesnik's assessment was that Marshall
suffered from major depressive disorder, recurrent;
posttraumatic stress disorder; and panic disorder with
agoraphobia. Tr. 227.  Dr. Nalesnik noted that the
results of her evaluation appeared to be consistent with
psychiatric problems that would interfere with

_____

31.  (...continued)
November 8, 2011).

Marshall's ability to function. Tr. 228. Dr. Nalesnik gave Marshall a referral number for intensive psychological case management; however, Marshall declined to call the 24-hour hotline because it was "too impersonal." Tr. 227.

On January 9, 2009, Dennis Gold, Ph.D., a state agency psychological consultant, reviewed the record, including Dr. Nalesnik's report, and concluded that Marshall had a major depressive disorder, panic disorder with agoraphobia, and posttraumatic stress disorder, which caused, at most, moderate limitations and did not meet or equal any listed impairment. Tr. 233-245. Dr. Gold opined that Marshall retained the ability to meet the basic mental demands of competitive work on a sustained basis despite the limitations caused by her impairments. Tr. 231. In arriving at his opinion, Dr. Gold gave Dr. Nalesnik's report great weight. Tr. 231.

On January 14, 2009, Marshall had an appointment with Dr. Murnin regarding her anxiety. Tr. 250.  The report of this appointment indicates that Marshall's

gastroesophageal reflux disease and high blood pressure were well controlled since her last visit. Id.  It was also noted that Marshall suffered from no medication side effects. Id.  When Dr. Murnin reviewed Marshall's systems his findings were all negative except Marshall did report with regard to her musculoskeletal system arthalgias, limitations of movement, swelling and tenderness and with regard to her mental status she report anxiety. Id.  Marshall's blood pressure was normal (118/78). Tr. 251.  The results of a physical examination were essentially normal, including that Marshall walked with a normal gait and had full range of motion with no discomfort. Id.  Marshall did have some pain at the base of the right thumb. Id. Dr. Murnin's neurological and mental status examination of Marshall was normal. Id.  Marshall was cooperative, her mood and affect were normal and she was oriented to person, place and time. Id.

On May 29, 2009, Marshall had a follow-up appointment with Dr. Murnin regarding her anxiety and

37

osteoarthritis. Tr. 247-249. Dr. Murnin noted that Marshall's anxiety "had been mostly controlled since last visit." Id.  Marshall denied depression and panic attacks. Id.  It was noted that Marshall's osteoarthritis (pain in the thumb) was "mostly well controlled since last visit" and she had no medication side effects. Id.  Marshall's gastroesophageal reflux disease was "mostly well controlled." Id.  Also, Dr. Murnin stated that Marshall's high blood pressure was well controlled. Id.  The results of a physical examination were essentially normal. Tr. 248. Marshall walked with a normal gait and had full range of motion without discomfort. Id.  Marshall had normal strength in the upper and lower extremities. Id.

The last medical records reviewed relate to an injury to Marshall's wrists in late 2009. Tr. 316-329. On November 7, 2009, Marshall fell while walking her dog and injured both wrists. Id.  X-rays and a physical examination revealed a right wrist fracture and left wrist sprain. By late December 2009, Marshall had

reduced swelling and pain and improved finger motion in the right wrist and decreased pain in the left wrist. X-rays of the right wrist on December 21, 2009, revealed a healed fracture, anatomic alignment, and no degenerative changes. Tr. 324.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Marshall had not engaged in substantial gainful work activity since September 8, 2008, the date her application for supplemental security income benefits was filed. Tr. 11.

At step two of the sequential evaluation process, the administrative law judge found that Marshall had the following severe impairments: high blood pressure, osteoarthritis, major depressive disorder, posttraumatic stress disorder, panic disorder with agoraphobia, and alcohol abuse. Tr. 11.  The administrative law judge found that Marshall's

gastroesophageal reflux disease and wrist injuries were
non-severe impairments.[32]  Tr. 12.

At step three of the sequential evaluation
process the administrative law judge found that
Marshall's impairments did not individually or in
combination meet or equal a listed impairment. Tr. 15.

At step four of the sequential evaluation
process the administrative law judge found that Marshall
had "the residual functional capacity to perform light
work" with certain limitations. Tr. 14.  Marshall could
never climb ladders, ropes or scaffolds; she had to
avoid hazards such as heights and machinery; she was
limited to understanding and remembering no more than

---

32.  An impairment is "severe" if it significantly
limits an individuals ability to perform basic work
activities.  20 C.F.R. § 404.1521.  Basic work
activities are the abilities and aptitudes necessary to
do most jobs, such as walking, standing, sitting,
lifting, pushing, seeing, hearing, speaking, and
remembering. Id.  An impairment or combination of
impairments is "not severe" when medical and other
evidence establish only a slight abnormality or a
combination of slight abnormalities that would have no
more than a minimal effect on an individual's ability
to work.  20 C.F.R. § 416.921; Social Security Rulings
85-28, 96-3p and 96-4p.

simple instructions involving routine, repetitive tasks in a stable work environment; she could only make simple decisions and carry out very short, simple instructions involving little independent decision making; and she could only have occasional interaction with the public. Tr. 14.  Marshall could perform repetitive task without constant supervision. Id.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Marshall had the ability to perform work as a garment bagger, bakery worker on a conveyer line, and a night cleaner, and that there were a significant number of such jobs in the regional and national economies. Tr. 18.

The administrative record in this case is 329 pages in length, which the court has fully reviewed. The administrative law judge did a thorough  job of reviewing Marshall's vocational history and medical records in his decision. Tr. 11-19.  Furthermore, the

41

brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. (Doc. 11, Def.'s Br. in Support.)  Marshall makes a rather general argument that the administrative law judge's decision is not supported by substantial evidence[33] and that the administrative law judge failed to consider appropriately the medical records and  Marshall's testimony and credibility.  The court finds Marshall's arguments to be without merit.

Initially it should be stated that no treating physician has provided a functional assessment of Marshall indicating that she is unable to perform for the requisite 12-month statutory period the limited range of light work found by the administrative law judge.  In this case the administrative law judge appropriately relied on the opinion of Dr. Gold in

---

33.  M.D. Pa. Local Rule 83.40.4(b) states in part that "[a] general argument that the findings of the administrative law judge are not supported by substantial evidence is not sufficient."

finding that Marshall had the mental ability to engage in full-time employment on a sustained basis.[34]

The administrative law judge stated that Marshall's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of light work. Tr. 15. The administrative law judge was not required to accept Marshall's claims regarding her limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the

---

34. Marshall does not contest the administrative law judge's evaluation of her physical impairments or physical residual functional capacity, i.e., she retained the ability to perform a limited range of light work. Furthermore, Dr. Murnin's treatment notes consistently indicated that Marshall's gait was normal, that she had full range of motion without discomfort and that she had normal motor strength in the upper and lower extremities.

credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Marshall when she testified at the hearing on January 20, 2010, the administrative law judge is the one best suited to assess the credibility of Marshall.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

s/Sylvia H. Rambo

United States District Judge

Dated: November 22, 2011

44

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHANIE MARSHALL,          :
                             :
          Plaintiff          :     CIVIL NO. 4:10-CV-1978
                             :
     vs.                     :
                             :
MICHAEL J. ASTRUE,           :
COMMISSIONER OF SOCIAL       :     (Judge Rambo)
SECURITY,                    :
                             :
          Defendant          :

**O R D E R**

In accordance with the accompanying memorandum,

**IT IS HEREBY ORDERED THAT:**

1.   The Clerk of Court shall enter judgment in favor of the Commissioner and against Stephanie Marshall as set forth in the following paragraph.

2.   The decision of the Commissioner of Social Security denying Stephanie Marshall supplemental security income benefits is affirmed.

      3.   The Clerk of Court shall close this case.

                            <u>s/Sylvia H. Rambo</u>
                                United States District Judge

Dated: November 22, 2011.